## HANEY SCHOOL FURNITURE COMPANY, for use, *v.* HIGHTOWER BAPTIST INSTITUTE.

1. There is no error in refusing to allow an amendment which has no relevancy to the cause of action set out in the petition, and which is offered merely for the purpose of rendering certain of the two panels of jurors disqualified. If such jurors be not impartial, a method is prescribed by law by which they may be set aside.

2. When a principal, after knowledge that an agent without authority has purchased for him certain property, retains possession and uses the same for a considerable period of time and obtains the benefit thereof, such acts constitute a ratification of the unauthorized act of the agent and render the principal liable for the payment of the purchase-money.

Argued April 1,—Decided April 25, 1901.

113 289
Case 2
122 340
113 289
124 964

113 289
Case 2
130 790

Complaint.  Before  Judge  Gober.  Forsyth  superior  court.
September 13, 1900.

*H. L. Patterson*, for plaintiff.    *H. P. Bell*, for defendant.

LITTLE, J.  The Haney School Furniture Company instituted an
action against the Hightower Baptist Institute, on an open account
for thirty school desks, one reading-chart, and a lot of blackboards.
It was admitted that the defendant was a corporation created for
the purpose of promoting education by carrying on a school, and
that its business was managed by a board of trustees; but it was
denied that defendant was indebted to plaintiff in any sum.    It ap-
pears from the evidence that the articles included in the bill of par-
ticulars were purchased from the plaintiff by one Booth, a former
principal of defendant's school located in Cumming.    Defendant
averred, that it had reasonably furnished its school-room with desks,
and never authorized Booth to make the purchase; that Booth was
dependent on the patronage of the school for his salary; that it be-
lieves that Booth bought the articles on his own account; that
when it ascertained that the claim was rendered against it, it re-
fused payment and notified plaintiff's attorney that the articles were
in the schoolhouse where Booth had placed them; and that defend-
ant had no claim on the property, and it was subject to the order
of the plaintiff.    We gather from the record, that the defendant
was incorporated to carry on a denominational school under the
patronage of certain Baptist churches which were united under the
name of the Hightower Baptist Association.    Much evidence was
introduced, and from the brief in the record the following undisputed
facts appear in connection with the transaction on which the suit
is based:    At the annual session of the association held in Milton
county on August 5, 1897, the chairman and secretary of the board
of trustees of the defendant corporation reported to the association
that the trustees had elected Rev. A. E. Booth as president of the
school, and called attention to some of the difficulties in the way of
the success of the school, among them, lack of equipment.    A part
of said report was in the following language:    "For the 110 pu-
pils in attendance there are less than one dozen good desks in the
building.  .  .    There are little or no equipments in the way of
tools to work with, that is blackboards, maps, and charts."    It was
stated also that they possessed property worth from $2,500 to

$4,000; that they had only an indebtedness of fifty dollars; that the insurance on the building was being carried by individuals; and that the property was depreciating in value. They asked the association, among other things, to make the necessary repairs, secure the payment of the insurance, equip the buildings, etc. At the association collections and subscriptions were taken for Hightower Baptist Institute, amounting to $147.50, and delegates from all the churches agreed to take subscriptions to make the needed repairs and furnish the proper equipments. From the minutes of the meeting of the board of trustees of Hightower Baptist Institute, held September 15, 1897, it appears that action was taken by the board in relation to the purchase of the desks, blackboards, etc., as follows: "On motion, authorized and empowered Prof. A. E. Booth to purchase as many desks, blackboards, charts, etc., as the means on hand will justify, but no further." To make out its claim, plaintiff introduced the depositions of Booth, who testified that the defendant got the goods charged; that they were ordered through him; that the trustees instructed him to order the goods, at a meeting in September, 1897; that on the report by the trustees of the institute to the association subscriptions were taken in open session during the association, to secure the money for the purpose of making the necessary repairs, purchasing desks, blackboards, etc., which were badly needed, and these subscriptions amounted to about $150, some of which were never paid; that, soon after the meeting of the association, the purchase of the desks and other articles contained in the invoice was considered by the board of trustees, and he as president of the school was authorized to purchase them. Out of the amount subscribed the freight and expenses of setting up the desks etc. in the school building had been paid. A considerable amount of the subscriptions had never been paid in. The price charged for the articles was reasonable, and the bill unpaid. He was operating the school for what he could make out of it; and he did not purchase the goods for his own account, but in consequence of the action of the board of trustees, etc.

On the part of the defendant several members of the board of trustees were witnesses, and testified in effect that the only authority which Booth had to purchase desks and other equipment was the action of the board of trustees above referred to; that Booth had no authority to buy these goods on time, or to incur a debt

against the institute or its trustees. Booth took the school for what he could make out of it, and the building was turned over to him just as it was then equipped. The board of trustees knew that the desks were purchased and put in the building, but thought they were paid for. As soon as they ascertained that they were not paid for, they held a meeting, repudiated the purchase, and disclaimed all title to or interest in the property so purchased, and notified the attorney for the plaintiff that the desks and other equipment were in the schoolhouse at his disposal and subject to his order. They thought the property belonged to the school until the trustees found out it had not been paid for. Some of the trustees who were witnesses in the case further testified that the desks, blackboards, etc., were still in the schoolhouse, and at the time of the trial were being used in carrying on the school by Prof. Callaway, who, by the action of the board of trustees, had succeeded Booth as president, and took the school just as Booth had it, for what it would pay; that the trustees turned the building over to Callaway just as Booth had left it; and that these desks and other equipment purchased were being used by the school. One of the trustees, Mr. Foster, after testifying that Booth had no authority whatever to buy on a credit and bind the institute or board of trustees or to make any debt against them, also testified that the trustees were under no obligation to buy any furniture or other supplies for the school. Booth was to run the school at his own expense. Booth's financial condition at that time was not good. The first time witness had notice that these desks were not paid for, and that there was a claim against the institute, was when the attorney for the plaintiff submitted the same about two or three months before the meeting of the board which repudiated the purchase of the desks etc. as their property. A special meeting of the board was afterwards called, and a resolution ignoring any claim to the desks, and informing the company through its attorney that the board disclaimed title to them or any interest in the property, and that it was in the building subject to their order, was passed. At the time the resolution to buy the desks was passed they had very little or no money on hand, only a few dollars. But a small amount of the subscription made at the association was collected. Witness, who was treasurer of the board, further said that the amount collected at the meeting of the association was either $7 or $17, which was turned over to Booth, who

was treasurer of the association, but he was never the agent of the board of trustees.

At the commencement of the trial the plaintiff submitted a motion to amend its petition by adding a new paragraph, which was, in substance, that defendant's property was owned and the school controlled by certain designated churches. This amendment the court refused to allow. The case was submitted to a jury, and a verdict was rendered in favor of defendant. A motion for a new trial was made and overruled ; and the plaintiff excepted to the refusal to allow the amendment, and also to the judgment overruling its motion for a new trial.

1. There was no error in rejecting the amendment. It appears from the note of the trial judge that at the time of offering the amendment plaintiff's attorney stated that his object in offering it was to disqualify as jurors the members of the churches which formed the association, who were serving on the jury. The amendment was entirely immaterial ; nor was it necessary that any amendment be made, to call in question the qualifications of any of the jurors. From and before the decision of the case of *Pike County* v. *Griffin & West Point Plank Road Co.*, 15 *Ga.* 39, it has been the law of this State that either party to a cause on trial has the right, in the selection of jurors to be empaneled on a particular case, to have excluded therefrom all who have declared an opinion on the merits of the case or who have a wish or desire that one of the parties thereto should prevail. In the case of *Howell* v. *Howell*, 59 *Ga.* 145, it was ruled by this court that a motion that the panel of twenty-four jurors be put upon their voir dire and questioned as to their competency and impartiality as jurors should have been granted by the presiding judge; and we know of no ruling by any subsequent decision to the contrary. After the rejection of the amendment in this case the jury were called, and those who were disqualified were set aside ; but, aside from this, as matter of law the amendment was not germane, and the court did not err in refusing to allow it.

2. Plaintiff sought to have the verdict set aside on the ground that it was contrary to the evidence and without evidence to support it. It is our opinion that under the evidence the plaintiff was entitled to have a verdict in its favor. It is undeniably true that the board of trustees were unwilling to have a debt created against

the corporation which they represented, and it is equally true that they did not authorize Booth to create the debt on which the suit was brought. It can not be gainsaid, however, that by their express and recorded action they did authorize Booth to purchase certain equipment for the school, although in doing so they limited him to the expenditure of the amount of money on hand; and clearly, as an original proposition, he had no right to go beyond it, or to create any debt at all. But in authorizing Booth to purchase the equipment to the extent of the funds on hand they constituted him their agent that far. When he went beyond that limit he exceeded his authority, and could not primarily contract a debt which, without their acquiescence, would be binding on the corporation. It is a clear case of the agent exceeding his authority. In such a case, in order to bind the principal, it must appear that he in some way ratified the unauthorized act. If he did, he is liable; if he did not, he is in no way liable for the debt. The Civil Code, § 3019, declares: "A ratification by the principal relates back to the act ratified, and takes effect as if originally authorized. A ratification may be express, or implied from the acts or silence of the principal. A ratification once made can not be revoked." We accept the evidence of members of the board of trustees who were sworn in this case as true; and as a matter of fact it must be conceded that when the board ascertained that Booth had exceeded his authority and purchased the desks and other equipment of the school on a credit, they in words repudiated that action, and notified plaintiff through its attorney that the goods bought were subject to its order. Therefore they were not silent, and the ratification of Booth's contract can not be declared in this case from the silence of the principal. The question, then, is narrowed to the enquiry whether the board of trustees ratified this contract of Booth by their acts. It was undoubtedly originally contemplated that the schoolroom should be supplied with desks and other equipment according to the means in the hands of the trustees. It can not be made a cause of difference, in the determination of the question of liability, that Booth took the school for what he could make out of it. The school building and the equipment which it contained were the property of the corporation and under the direct control of the trustees; and in turning over the school building and the furniture therein to Booth, the trustees of the defendant corporation were but carrying out the

object of the incorporation, which was to maintain a school. It is conclusively shown that while the trustees were unwilling to better equip the school building by incurring a debt, yet, after having learned that the desks etc., which were placed in the school building for the use of the school which they were appointed to maintain, had been purchased by Booth on credit, they allowed such desks and other equipment to remain in said school building and be used by the president and scholars from the time of such discovery up to the time of the trial of the case.

The trustees, then, are placed in this position: They did not authorize Booth to purchase this furniture on credit. As soon as they learned he had done so, they notified the seller that Booth had no authority to contract the debt for them, and that they would not be bound thereby, and disclaimed title to the property. Had they stopped here, and caused this property to be taken from their building, or stored it unused there or elsewhere, their claim would have been perfectly sustained; but, after having disclaimed title, the fact remains that they continued to use it for a year or more, having all the benefits of it, and, notwithstanding their disclaimer, kept it for the use of the school. It must be held that such action ratified the purchase made by Booth. It is not a sufficient answer to this proposition to say that this equipment is being used by Prof. Callaway, the successor of Booth. This is so for the reason that Callaway was put there by the trustees, and was furnished the school building and the furniture belonging to it. When Booth left the building he left therein this equipment, which the defendants claimed belonged to the plaintiff. Callaway was admitted by their action, and permitted by them to use the furniture which was in their building; and this having been bought by Booth in their name and placed in their building, they should in some manner have excepted such furniture from Callaway's control in carrying on the school for them. They could not permit such use of it by him as a part of the furniture of their school building without working a ratification of the purchase made by Booth. And while a disclaimer of title and notification to the seller that the trustees of the school building had no claim to this furniture which was being used therein was made, it was not alone such a sufficient repudiation as would free the trustees from liability if they continued to use it in the business of their corporation. In the case of Wright

*v.* Vineyard Methodist Church, 72 Minn. 78, 74 N. W. 1015, the pastor of a church purchased an organ for the use of the church, and claimed that it was purchased by its authority. This was denied. At the time of its receipt the trustees of the church did not know that it had been purchased, but were told that the pastor had ordered it for a particular occasion. After ascertaining the fact of the purchase the trustees notified the plaintiff that the pastor had no authority from them to purchase the organ, but it was allowed to remain in the church and was continually used therein. The Supreme Court of Minnesota ruled that, if the pastor was not originally authorized to purchase the organ for the church, under the facts its trustees subsequently ratified his acts. The general rule is found stated in Mechem on Agency, § 148. The author precedes a statement of the rule with the assertion that the methods by which ratification may be effected are as numerous and as various as the complex dealings of human life. But he adds "that he who would avail himself of the advantages arising from the act of another in his behalf must also assume the responsibilities. If the principal has knowingly appropriated and enjoyed the fruits and benefits of an agent's act, he will not afterwards be heard to say that the act was unauthorized. One who voluntarily accepts the proceeds of an act done by one assuming, though without authority, to be his agent, ratifies the act and takes it as his own with all its burdens as well as all its benefits. He may not take the benefits and reject the burdens, but he must either accept them or reject them as a whole."

This court in the case of *Byrne* v. *Doughty & Beall*, 13 *Ga.* 53, citing Story on Agency, says: "To bind the principal there is no necessity for a positive or direct confirmation, on his part, of the act of the agent, but it may arise, by implication, from the acts or proceedings of the principal in pais. . . And for this purpose the acts and conduct of the principal are construed favorably in favor of the agent. Slight circumstances and small matters will sometimes suffice to raise the presumption of ratification. . . Authority to do the act is presumed from subsequent acts of assent and acquiescence." In the case of *Hodnett* v. *Tatum*, 9 *Ga.* 70, it was ruled that the principal can not of his own mere authority ratify the acts of his agent in part in regard to a particular transaction and repudiate them as to the rest; and in the opinion Judge

Warner, referring to the facts in that case, said: "If he [the principal] did not intend to ratify the act of his agent in receiving the Alabama money, he ought to have returned it within a reasonable time, and not have retained it upon his own arbitrary terms." McCay, J., in the case of *Ketchum* v. *Verdell*, 42 *Ga.* 538, said: "If the principal accepts the property knowing all the facts, that is a ratification of the agency." In *Murray* v. *Walker*, 44 *Ga.* 58, it was ruled that "the taking of Confederate currency by the principal and its use by him was a ratification of the act of the agent." To the same effect is the ruling made in the case of *Gilbert* v. *Dent*, 46 *Ga.* 238. The trustees of the defendant corporation were evidently unwilling to create a debt and did not intend to buy this furniture on credit, and they had the right to refuse to do so if they wished; but when they discovered that Booth had purchased the furniture on their account, then was the time, not simply to repudiate the action of Booth in words, but to repudiate it altogether. If after such discovery they had declined to use the desks and other property sold, which, being in their building as a part of the equipment, were being used by them through Callaway, their agent, but had returned them or taken them out of their building after proper notification, their wishes would have been accomplished. But when after the knowledge of Booth's purchase they continued to use it by their agent and employee, knowing that Booth claimed to have bought it for them, that use of it made it their property by ratification. Its use by the school was their use. It must, therefore, be ruled that, as this evidence of ratification and use of the property was uncontradicted, the verdict rendered was contrary to the evidence in the case, and that the court erred in overruling the motion for a new trial.

　　*Judgment reversed*　　*All concurring, except Lewis, J., absent.*